# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 6009 | **DATE** | 6/15/2000 |
| **CASE TITLE** | | Honorable, et al. Vs. Easy Life Real Estate, et al. | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order denying defendants' motion for summary judgment. Ruling set for 7/21/00 is therefore vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

*4*
number of notices

*6-16-00*
date docketed

*BW*
docketing deputy initials

6/15/2000
date mailed notice

Document Number

*122*

MPJ

courtroom deputy's initials

Date/time received in central Clerk's Office

MPJ

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RUBY HONORABLE, MACK WILLIAMS, SHIRLEY ROLLINS, STEKEEN ROLLINS, NORRIS BOSTON, MARTHA BOSTON, DONALD BROWN, SONYA BROWN, individually and on behalf of all persons similarly situated, SOUTH AUSTIN COALITION COMMUNITY COUNCIL, MARILYN WILLIAMS, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )  No. 97 C 6009 |
| EASY LIFE REAL ESTATE SYSTEM, ACE REALTORS, INC., RICHARD F. NELON, and LOUIS PRUS, | ) ) ) ) ) |
| Defendants. | ) |

DOCKETED
JUN 16 2000

## MEMORANDUM OPINION AND ORDER

This case poses, most centrally, the question of what is required to make out an "exploitation" theory of liability for racial discrimination in the sale of real estate. The plaintiffs here are African-Americans who sought to buy rehabbed homes offered for sale by the defendants in or near the predominantly black Austin area on the west side of Chicago, Illinois. They claim that the defendants' selling practices violated 42 U.S.C. §§ 1981-82 (civil rights), and 42 U.S.C. § 3604(b) (Fair Housing Act), by

taking unfair advantage of unsophisticated first time buyers in a racially discriminatory way.[1] The defendants move for summary judgment, and I deny the motion.

## I.

During the period of the violations alleged in this case, Easy Life Real Estate System ("Easy Life") offered homes it represented to be fully rehabbed for sale to first time buyers at very low down payments. It targeted the 95% African-American community of Austin on the West side of Chicago, arranging for Federal Housing Administration ("FHA") insured loans from certain lenders. Easy Life's agents told Ruby Honorable that one home in Austin, which she eventually bought, was "the only one" she qualified for. They falsely told Shirley and Stekeena Rollins that an Austin house Easy Life was selling was really in adjacent Oak Park, and then, when that deception was discovered, that it was too late to back out of the deal, although it was not. Easy Life's agents did not allow

---

[1] The plaintiffs also sued under the federal racketeering statute, 18 U.S.C. § 1962 ("RICO"), as well as various state law causes of action. In a previous opinion, I certified the class with respect to the discrimination claims for liability purposes, dismissed the plaintiffs' RICO and state law fraud claims, and limited the injunctive relief they might seek for the remaining state law claims, leaving this essentially as a discrimination case. *See Honorable v. Easy Life Real Estate System*, 182 F.R.D. 553 (N.D. Ill. 1998) (laying out in more detail the identity of the parties and the background to this case).

negotiation on the price of homes. They gave the buyers the funds for their down payments, making it appear that the money was a gift from a relative. They paid off Ms. Honorable's outstanding debts. Easy Life encouraged plaintiffs to bring in family members as co-signers, and had buyers sign blank pieces of paper where an explanation for credit delinquency could be filled in later. Easy Life prevented or discouraged plaintiffs from inspecting the homes, which were very shabbily done and not properly rehabbed.

## II.

### A.

In these circumstances, the plaintiffs argue that Easy Life and the other defendants (1) exploited unsophisticated buyers in a dual, racially segregated housing market by taking wrongful advantage of a situation created by socioeconomic forces tainted by racial discrimination. In doing these things, according to the plaintiffs, the defendants also (2) intentionally discriminated against African-American home buyers by deliberately targeting them with predatory sales practices, committing "reverse redlining." The Fair Housing Act also allows for (3) disparate impact liability, but that is not at issue here. The defendants ask for summary judgement because the law requires that for exploitation theory liability, they must be shown to have "market

-3-

power," enough influence to shape the market, but their expert testimony shows that the defendants did not have market power in the relevant market.

Under the "exploitation" theory, as the Seventh Circuit explains it, the plaintiffs argue that:

> As a result of racial discrimination there existed two housing markets . . . , one for whites and another for blacks, with the supply of housing available in the black market far less than the demand. Defendants entered the black market selling homes for prices far in excess of their fair market value and far in excess of prices which whites pay for comparable homes in the white market and on more onerous terms than whites similarly situated would encounter. . . .

*Clark v. Universal Builders*, 501 F.2d 324, 328 (7th Cir. 1974) (*Clark* I). To establish "exploitation" liability, the plaintiffs must show that (1) as a result of racial segregation, dual housing markets exist, and (2) defendant sellers took advantage of this situation by demanding prices and terms unreasonably in excess of prices and terms available to white citizens for comparable housing. *Clark v. Universal Builders, Inc.*, 706 F.2d 204, 206 (7th Cir. 1983) (*Clark* II). Here (1) is not in dispute. Rather, the defendants argue that (2) is not true, that they could not have done what the plaintiffs allege because they lacked market power.

The defendants' claim that exploitation requires market power is derived from its reading of *Clark* II, where the Seventh Circuit

-4-

held that this theory of liability "does not eliminate questions about how a business can set its prices above a reasonable level. In the absence of collusion, or a situation of a business having sufficient market power of its own, it is difficult to understand how a business could retain its market share against non-exploiting competitors." 706 F.2d at 212 n.8. The plaintiffs there "presented no plausible explanation of how defendants could have charged unreasonable prices in the face of a market for housing which showed no indicia of being monopolized or uncompetitive. In other words, there [was] no adequate explanation of how the defendants could have obtained the market power to do what they [were] accused of doing." *Id.* at 211.

The language quoted by the defendants, however, does not support the claim that exploitation liability requires market power in the traditional sense of a large enough share of the market. What the Seventh Circuit requires, rather, is an economically credible explanation of how an exploiter can stay in business charging above-market prices. *Clark* II suggests that this could be established in at least three ways: by a showing of (1) collusion, (2) market power based in market share, or (3) some other basis not there offered by the plaintiffs. The Seventh Circuit does not make

market power necessary for exploitation liability, as is shown by the explanatory qualification at 706 F.2d at 212 n.8, cited by the defendants themselves. Market power based in market share is just one way to show the mechanism by which the exploitation occurs. A plaintiff may show others.

B.

The plaintiffs do not argue that the defendants colluded with anyone else to raise prices in the relevant market. They rather argue that there was a mechanism other than possession of market power through which the defendants charged African-American home buyers housing prices unreasonably in excess of what white buyers were charged. The plaintiffs say that this case "involves much more than . . . excess pricing"; it also involves "a pattern of deception and misrepresentation targeted at first time home buyers in the overwhelmingly minority Austin community." In particular, the evidence in the record shows that the defendants "were deliberately depriving buyers of truthful information necessary to take meaningful advantage of competitive alternatives" by "grooming buyers who were totally dependant on Easy Life."

According to the plaintiffs, then, the defendants were able to exploit African-Americans by carving out a noncompetitive enclave in the market. Whether or not the defendants had market power in

the relevant market, they were able to retain their market share and persist in these practices while charging above-market prices by, in effect, taking the unsophisticated, first-time minority buyers who had the misfortune to fall into their clutches out of the competitive market by deceptively making these buyers wholly dependant upon them for the mechanics and wherewithal of home-buying, controlling their access to potential properties, loans, down payments, attorneys, and all their information. Their theory tracks the analysis of Professor Hanson and Douglas Kysar, who argue that "market outcomes frequently will be heavily influenced, if not determined, by the ability of one actor to control the format of information, the presentation of choices, and, in general, the setting within which market transactions occur," allowing some to "exploit those tendencies for gain." Jon G. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: The Problem of Market Manipulation*, 74 *N.Y.U. L. Rev.* 630, 635 (1999). This is what the plaintiffs argue happened here. In the *Clark* cases, by contrast, there was no such evidence of markets being distorted by deception-driven dependency on the seller, and thus *Clark* II is distinguishable.

This is a novel, innovative and serious argument. Courts have been reluctant to assume consumers are too ignorant and benighted to fend for themselves merely because they are poor. *See, e.g., Miller v. Civil City of South Bend,* 904 F.2d 1081, 1098 (7th Cir. 1990), *rev'd on other grounds by Barnes v. Glen Theatre,* 501 U.S. 560 (1991) ("The robust paternalism and class consciousness that once permitted such a distinction have lost their legitimacy.") (free speech context). However, this is not a case where a court makes unwarranted presumptions that people lack the information, confidence, and experience to be "normal" consumers. Here the plaintiffs themselves argue that they were thus limited. Therefore, I do no more than take the plaintiffs at their word. That is not class snobbery or paternalism.

More deeply, the economic theories that imply that market prices are efficient, thus beneficial for consumers, presuppose that consumers are informed, markets are competitive, and the costs of making transactions are not excessively burdensome. To produce theoretical equilibrium, neoclassical economics in fact assumes *perfect* information, *perfect* competition, and *no* transaction costs, among other idealizations. But these assumptions must be relaxed, and perhaps, ultimately replaced, if economic theory is to have any

application to what happens in actual markets.[2] In the ordinary case, the assumptions are roughly approximately true, or it would be a miracle if the theory had any degree of predictive or explanatory power. However, if these conditions fail to obtain to a sufficient degree, even the rough efficiency of the market outcome can no longer be presumed. The conclusion (that markets are efficient) no longer follows from the premises.

Housing markets in particular, even in the ordinary case, may well be several steps removed from the standard assumptions because of the special characteristics of the product and the complexity of

---

[2] Recent research has pointed towards developing a new approach to the application of economics that treats these deviations from standard assumptions systematically. *See* generally Richard H. Thaler, *Quasi-Rational Economics* (1991). The term "quasi-rational" refers to the fact that people's actual behavior departs from that of the "rational actor" posited by standard economic models. The recent development of "behavioral" law and economics attempts to apply a more realistic set of assumptions. *See Behavioral Law and Economics* (Cass R. Sunstein ed. 1999); Symposium, *The Legal Implications of Psychology: Human Behavior, Behavioral Economics, and the Law*, 51 *Vand. L. Rev.* 1495 (1998).

Judge Posner contends that behavioral law and economics is "merely a set of challenges to the theory-builders" rather than a theory itself. Richard A. Posner *Rational Choice, Behavioral Economics, and the Law*, 50 *Stan. L. Rev* 1551, 1560-61 (1998). This is fair enough, at least so far, but that does not mean the criticisms are not valid. More fundamental discussions of the limits of economic rationality can be found in Jon Elster, *Sour Grapes: Studies in the Subversion of Rationality* (1983) and Elizabeth S. Anderson, *Value in Ethics and Economics* (1993).

the transaction. Professor Eskridge argues that research shows that "homebuyers usually do not engage in wealth-maximizing behavior but, instead, act like 'satisficers.' They search for alternatives until they find one that is 'good enough,' rather than 'best.'" William N. Eskridge, *One Hundred Years of Ineptitude: The Need for Mortgage Rules Consonant with the Economic and Psychological Dynamics of the Home Sale and Loan Transaction*, 70 *Va. L. Rev.* 1083, 1114 (1984) (internal citations omitted). Eskridge notes that although "satisficing . . . generally yield[s] good results for low-cost decisions, it may be a poor strategy for high-cost decisions such as buying and financing a home. A bad decision made on insufficient information costs the homebuyer thousands of dollars." *Id.* First time homebuyers are less likely to shop around because of stress. *Id.* at 1116 (internal citations omitted). Moreover, even in the ordinary case, "the formally integrated transaction," combining all the financial aspects of homebuying into a package, means that "shopping is curtailed and rational decisionmaking made more difficult." *Id.* at 1126 (internal citations omitted).

When this situation is combined with evidence of racially discriminatory market manipulation by control of information and

all aspects of the transaction in a context where the homebuyers are arguably especially vulnerable to manipulation, the plaintiffs have come forward with evidence that the business practices of the defendants might well have distorted the markets enough to enable them to stay in business while charging above market rates to their selected clientele.

Moreover, the defendants do not really challenge this claim. They might have argued that the plaintiffs had not shown that Easy Life's customers really had no other options once Easy Life got hold of them, but, as explained below, the defendants merely assume that ordinary, "rational" consumers would have had other options and taken them. An undefended assumption, even if it is part of an economic theory, is not enough to carry a summary judgment motion in the face of competent evidence that the assumption is false. The defendants rest their case for summary judgment on the proposition that the plaintiffs must show that they had market power. They do not adequately consider any other ways that the defendants could get away with selling houses at noncompetitive rates, such as the market distortion theory. The defendants, therefore, have waived this response.

The defendants' direct attempt to deal with the plaintiffs' market distortion argument is to argue, first, that under the

plaintiffs' theory, "any seller of the home at the market price would be guilty of exploitation." This would "revolutionize the economic structure in Austin, resulting in the flight of businessman and service providers to avoid claims of exploitation based on race." The defendants thus recycle the argument that attempts to enforce civil rights legislation will backfire, harming the people it is supposed to benefit as businesses flee to avoid lawsuits. They offer no evidentiary or legal support for this ancient and disreputable proposition.

Second, the defendants argue that the plaintiffs' theory opens unlimited vistas of liability. This represents a misunderstanding. For the plaintiffs' theory to succeed, the plaintiffs must show that (1) the prices charged were systematically above-market; this could not be presumed merely from a showing that the market was distorted;[3] (2) the purported exploiters deliberately subverted the conditions for market competition by closing off access to alternatives and information, deceptively making naive and

---

[3] The plaintiffs' evidence of overpricing is mainly that the condition of the houses was too awful to bear the tariff Easy Life charged. This is circumstantial, but it is not defeated by the defendants' claim that the price was efficient because it was the price charged in the market, a question-begging argument unless the presuppositions of efficiency are demonstrated in the face of the plaintiffs' challenge.

unsophisticated people dependant on them; this could not be shown from the mere existence of imperfect competition; and (3) there was racial discrimination involved in this exploitative process. The defendants' hypothetical African-American Austin homeowner offering his own home for sale at the market rate would, therefore, be safe.

C.

I here consider whether the defendants could prevail on their chosen terms. Did Easy Life have market power in the relevant market anyway? The defendants argue that for market power, Easy Life, as a matter of law, must have had at least a 35% market share in the relevant market, referring to the Federal Trade Commission's Horizontal Merger Guidelines, which state that firms with a market share below 35% are presumed to be unable to exercise market dominance. *See also Valley Liquors, Inc., v. Renfield Importers, Ltd.,* 678 F.2d 742 (7th Cir. 1982) (*Valley* I) (antitrust), *and* 822 F.2d 656 (7th Cir. 1987) (*Valley* II) (same).

The plaintiffs respond that antitrust standards do not apply in a discrimination context. Antitrust laws are meant to encourage vigorous competition, promote economic efficiency, and maximize consumer welfare. *MCI Communications Corp v. AT&T Co.,* 708 F.2d 1081, 1113 (7th Cir. 1982). The FHA, by contrast, "is concerned

with ending racially segregated housing." *Southend Neighborhood Improvement Assoc. v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir. 1984). Sections 1982 (no racial discrimination in housing)and 1981 (same for contracts) are likewise civil rights laws. Where the goals differ, the plaintiffs say, so should the standards.

But the defendants are correct that, in the absence of some other mechanism, which, in this subsection, I assume for the sake of argument is lacking, the defendants would not have the "capability," required by *Clark* II, 706 F.2d at 212, to affect prices without market power. The antitrust standard for market share is not addressed to narrow antitrust concerns of efficiency as opposed to nondiscrimination, but to what courts have held to be required by economic theory to affect price in an otherwise competitive market. If the defendants cannot affect price, they cannot exploit minorities by discriminatory pricing.[4] So, setting aside other novel mechanisms such as the market distortion argument discussed above, the plaintiffs must show that the defendants had market power in the relevant market. This does not go to whether the defendants committed illegal discrimination under

---

[4] On the plaintiffs' own market distortion theory, the markets are not otherwise competitive; the discriminatorily created dependency is what serves the function of market-share based market power in the standard theory.

-14-

some other theory than the exploitation theory, as discussed below.

The defendants argue that the relevant market is all available residences in the predominantly African-American areas of Chicago and its suburbs.[5] They offer expert testimony by economists at Lexecon, Inc., a research firm that provides economic analyses for legal purposes, that Easy Life's market share of "all African-American residents" in the greater Chicago area was approximately 4.1 percent. Even in the Austin market, the defendants' analysis indicates that its market share was only between 6 and 10.5 percent. Lexecon concludes that there were no significant barriers to market entry even in Austin, where at least 25 other sellers of homes operated during the period of the alleged violations, and at least six other firms were rehabbing homes. The plaintiffs object that the Lexecon analysis understates Easy Life's market shares by 100%, because it treats Home Mortgage Disclosure Act figures

---

[5] The defendants also say that "the proper definition of the relevant market includes all residential options available to African-Americans . . . in Chicago and its suburbs." As we do not have legally segregated housing, and African-Americans, at least in theory, can live anyplace they can afford, that would mean the relevant market is the whole Chicagoland area. However, the defendants' expert study restricted its analysis to the predominantly African-American areas, on the unfortunately plausible assumption that in a housing market as segregated as Chicagoland, many predominantly white areas are not in practice reasonably available to African-Americans.

-15-

referring to single family homes, defined as one-unit to four-unit properties, as if the figures represented only single-unit properties. The corrected figures nonetheless do not push the figures up to the 35% market share.

I agree with the plaintiffs, however, that their own experts' analyses have generated a triable issue of fact as to whether the defendants had market power. First, the defendants' argument that the relevant geographical market is all the predominantly African-American residential areas of Chicago presumes that rational and informed buyers, facing above-market prices for decrepit properties in Austin, would look elsewhere. However, Lexecon does not justify the assumption that the plaintiff class is well enough described by the ideal rational actor picture as would be required to make this story work. The plaintiffs, on the other hand, specifically dispute the claim, presenting expert testimony that members of the class are, rather, especially unsophisticated, uninformed, naive, vulnerable, and easily prey to misrepresentation and pressure of the sort that they contend the defendants committed. A rational jury might find that the members of the class, because of their special characteristics and the defendants' conduct, would be unlikely to substitute housing outside of Austin. There is, therefore a jury question about whether the geographical limits of

the relevant market is Austin or a wider area.

Second, there is a material issue about whether the defendants exceeded the 35% requirement for market power. The plaintiffs offer expert testimony that Easy Life dominated the rehabbed homes market in Austin, listing or selling 63% of the rehabbed homes in Austin during the time in question. The Lexecon analysis does not directly address whether the rehabbed homes market in Austin is the relevant product market. The argument that rational buyers would substitute cheaper homes offered by others outside Austin for more expensive homes offered by Easy Life in Austin suggests that Lexecon would say the same thing about rehabbed as opposed to nonrehabbed homes, in Austin or elsewhere, as standard economic analysis would imply.

But, as explained, standard economic analysis may not apply to the plaintiff class in anything like the straightforward way that Lexecon assumes. The plaintiffs offer evidence that Easy Life's customer base may have been attracted to home ownership in Austin specifically by the prospect of obtaining a rehabbed property (perhaps on the assumption that they could afford nothing else), and so a rational finder of fact could conclude that Easy Life controlled more than 35% of the relevant product and geographical market so understood. These empirical arguments based in the plaintiffs' concrete circumstances cannot be defeated by a one-

size-fits-all use of economic theory where the applicability of its fundamental assumptions to the facts at hand are put in question by competent evidence in the case.

## III.

Even if I were to accept the defendants' arguments about market power, there is an alternative reason why summary judgment cannot be granted. The defendants' motion is directed solely to the exploitation theory. It does not address the plaintiffs' intentional discrimination claims about "reverse redlining." Redlining is the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents.[6] Reverse redlining is the practice of extending credit on unfair terms to those same communities. See S.Rep. No. 103-169, at 21 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1905; *see also Reverse Redlining: Problems in Home Equity Lending*, before the Senate Committee on Banking, Housing, and Urban Affairs, 103rd Cong. 243-471 (1993).

These sort of practices come within the ambit of the Fair Housing Act; *see NAACP v. American Family Mut. Ins. Co.*, 978 F.2d

---

[6] The term was derived from the actual practice of drawing a red line around certain areas in which credit would be denied. *United Companies Lending Corp. v. Sargeant*, 20 F. Supp.2d 192, 203 n.5 (D. Mass. 1998).

-18-

287, 301 (7th Cir. 1992) (discriminatory denials of insurance and discriminatory pricing), which is to be read broadly. Courts have construed the statute to cover "mortgage 'redlining,' insurance redlining, racial steering, exclusionary zoning decisions, and other actions by individuals or governmental units which directly affect the availability of housing to minorities." *Southend Assoc.*, 743 F.2d at 1209-10 & n.3 (citing cases). The law is "violated by discriminatory actions, or certain actions with discriminatory effects, that affect the availability of housing." *Id.* at 1210. If so, the law would also prohibit reverse redlining. Although sections 1981 and 1982 are narrower, *id.*, they may be construed to prohibit some or all of the practices of which the plaintiffs produce evidence here; the defendants have at least waived the right to argue the contrary here by failing to do it.

## IV.

In sum, the plaintiffs have indicated a mechanism whereby the defendants might have exploited minority homebuyers in Austin by discriminatorily creating dependency and distorting the housing market. The plaintiffs have also raised a triable issue of fact about whether the defendants had market power in the relevant market because the special characteristics of the plaintiff class

could have inhibited the substitution that would have widened the relevant market and diluted the defendants' market share. Finally, the defendants do not address the plaintiffs' arguments based on an intentional discrimination rather than an exploitation theory. Therefore I Deny the defendants' motion for summary judgment.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated:     June 15, 2000

Copies are being mailed to:

Nina E. Vinik
Chicago Lawyers' Committee for
 Civil Rights Under Law, Inc.
100 N. LaSalle Street, #600
Chicago, IL  60602

Thomas F. Geselbracht
Piper Marbury Rudnick & Wolfe
203 N. LaSalle Street, #1800
Chicago, IL  60601

Attorneys for Plaintiffs

Victor F. Ciardelli
Ciardelli & Cummings
19 W. Jackson Blvd., #300
Chicago, IL  60604

Steven Ackerman
Attorney at Law
566 W. Adams Street, #600
Chicago, IL  60661

Attorneys for Defendants